IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

JESSICA ANDREAS and JENNIFER LOPEZ,

      **Plaintiffs,**

v.                                **Case No. 07-CV-00312 JC/ACT**

NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY/NORTHWESTERN
MUTUAL and BRIAN BAILEY,

      **Defendants.**

## MEMORANDUM OPINION AND ORDER ON DEFENDANT BRIAN BAILEY'S MOTION FOR SUMMARY JUDGMENT ON PLAINTIFF ANDREAS' CLAIMS

THIS MATTER comes before the Court on Defendant Brian Bailey's *Motion for Summary Judgment on Plaintiff Andreas' Claims* (Doc. 112) ("Motion"), filed June 30, 2008. The Court has reviewed the parties' submissions and, being otherwise informed in the premises, finds that Defendant Bailey's motion is well-taken and should be granted.

## I.    BACKGROUND

Plaintiff Jessica Andreas began working with Northwestern Mutual and Defendant Bailey in September 2001.  She claims that from this time through her resignation in mid-March 2005, she was subject to a hostile working environment.

In 2001-2002, Andreas alleges that Bailey teased her in front of other financial representatives about her previous job at Hooters.  She contends that he often criticized her, saying things like, "Do you want to go back to being a waitress?" and "Do you want your daughter to end up like you are?" and "If you can't do this, you can't do anything."  As a result of this type of treatment, Andreas claims that she and other women in the office were frequently

in tears.  At one sales meeting, Andreas contends that Bailey told the female representatives, "I bet if I put a gun to your face you'd get your cold calls made."  When Andreas objected to this type of treatment, she claims that Bailey would lecture her about her dislike of expectations and be sarcastic, asking, "If I give you a gold star would that make you happy?" or mock her in front of other representatives, saying she would get an ice cream cone on Fridays.  Bailey also scrutinized her absences from the office and "berated" her for failing to take the job seriously. When Andreas won a Rookie of the Year award, Bailey commented, "I'm really surprised you're still here.  I didn't think you'd make it."

She contends that Bailey did not treat the male representatives as he treated her and the other female representatives.  In fact, Andreas claims that Bailey said he was going to stop hiring females because they were "too much trouble" and "too sensitive."  On one occasion, date unknown, Andreas claims Bailey told a newer male representative to tell his wife, who had recently given birth, to sleep on the couch with the baby because he "ha[d] a job."  On another occasion, Andreas says Bailey told her co-plaintiff Jennifer Lopez not to look at him a certain way because he "ha[d] a wife at home."  In July 2004, Bailey allegedly took the male representatives to a nice dinner, but the female representatives were not invited.

According to Andreas, Bailey also made a few sexually charged comments that affected her work environment.  She contends that Bailey and other Northwestern Mutual representatives "taunted" her at a banquet in early 2004, yelling that she should "jump" during a song entitled "Jump" while she was wearing a strapless gown.  After her female coworker, Rhawnie Milliorn, wore a tube top on an unknown date, Bailey and other male representatives allegedly started joking about "tube top Tuesdays" and about Milliorn's thong underwear, which Andreas

2

acknowledges was visible.  At a baseball game Bailey took representatives to in July 2004, Andreas complains that Bailey and some of her male coworkers commented on the breasts of women who walked up and down the aisle near their seats and also tried to throw peanuts down her shirt.  At the January 2005 awards banquet, which was designated as a costume party, Andreas claims that Bailey made unspecified comments about her medieval queen costume and took a picture down the front of her dress.

Bailey would also reportedly pry into Andreas' personal life, particularly into her relationship with Antonio Molina, who was one of the male financial representatives at the same Northwestern Mutual branch where Andreas and Bailey worked.  After Andreas and Molina ended their relationship, Molina began dating Dianne Jaramillo, who also worked at Northwestern Mutual, and Bailey allegedly congratulated Molina for "getting those girls to fight over you."

Andreas also contends that Bailey failed to respond appropriately to her reports of misconduct by her male coworkers.  In 2002, Andreas attended a regional meeting where she claims she was drugged and sexually assaulted by a male representative from a Northwestern Mutual office in another state.  Some time thereafter, Andreas says she told a recruiter that Northwestern Mutual should do more to protect female representatives, particularly college interns, and Bailey yelled at her and told her not to discuss the incident.  In early 2005, Andreas complained to Bailey after her coworker Chris Padilla made inappropriate, sexually charged comments about the costume Andreas wore to the January 2005 banquet.  Andreas claims Bailey's initial response was to laugh at her.  Although Bailey later investigated the incident and requested that Padilla make a written apology, Andreas contends this was not a sufficient

response and requested that Bailey sanction Padilla.  Bailey declined and allegedly asked

Andreas, "Why do you want to create more problems?  You have enough problems already."

    In retaliation for Andreas' continuing complaints about the way Bailey handled the

Padilla incident, Andreas claims that Bailey withheld significant percentages from her

commissions in February and March 2005.  Bailey also allegedly made improper withholdings

from her commissions in April 2002, June 2002, December 2002, and May 2003.  As of August

2003, Andreas says Bailey should have stopped withholding 10% of her commissions, yet Bailey

allegedly continued this practice through October 2003.  Andreas additionally complains that

Bailey got inappropriately involved in her personal finances, even going so far as to make her a

budget.

    Bailey also allegedly discriminated against Andreas and other female representatives by

providing more and better sales leads to the male representatives.  For example, in 2003,

Andreas says she received zero leads from the Northwestern Mutual client St. Vincent Hospital

in Santa Fe, while Antonio Molina received nine St. Vincent leads.  Andreas claims her

production at the time was equal to or better than Molina's.  Andreas contends that Bailey

similarly discriminated against the female representatives in 2004, when her co-plaintiff Lopez

and female representative Rhawnie Milliorn each got one St. Vincent lead while Lucas Romero

received five.  In 2005, after Andreas' resignation, she claims that Bailey assigned three St.

Vincent leads to Romero but only two apiece to Lopez and Milliorn.

    Andreas resigned her employment, providing a month's notice, in March 2005.  Her

termination from Northwestern Mutual was effective on April 15, 2005.  On April 8, 2005,

Bailey assigned a St. Vincent lead to Lucas Romero.  Andreas contends this lead should have been assigned to her given that she was in danger of meeting sales requirements.

Bailey's allegedly inappropriate withholdings from Andreas' commissions reportedly continued after she left Northwestern Mutual.  Andreas claims that she was not paid any portion of the $3513.59 balance in her large escrow account as of April 2005.  She says Bailey withheld 92% of a commission that Andreas received in May 2005.  In August 2005, Bailey agreed to pay Andreas only half of her unpaid commissions, and, when those commissions were later reversed, Andreas claims Bailey threatened to send her to collections even though he did not treat male representatives the same way.

On January 27, 2006, Andreas signed an EEOC charge, which was filed with the EEOC on January 31, 2006.  In this charge, Andreas contends that she "was subjected to different terms/conditions of employment [and] a hostile work environment which consisted of being harassed, humiliated, and demeaned by" Bailey.  Andreas' charge further states as follows:

> If any of the women spoke up we were faced with Retaliation in that the men were promoted and the women were not, and the men were given substantially more sales leads.  The Agency Director also stated that he was going to stop hiring women agents because they were "too much trouble and too sensitive."  The company has discriminated against and continues to discrimination [sic] on the basis of sex-female with respect to hiring, promotion, compensations, sales leads, discipline, terminations, and other conditions and privileges of employment.

*Def.'s Memo. In Supp. Of Motion for Summ. Judgmt.* (Doc. 115) ("Memo.") at Ex. O.

## II.   LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact

and that the movant is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). A "genuine" issue of fact exists where the evidence is such that a reasonable jury could resolve the issue either way. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In response to a motion for summary judgment, a party "may not rely merely on allegations or denials in its own pleading; rather, its response must—by affidavits or as otherwise provided in this rule—set out specific facts showing a genuine issue for trial." FED.R.CIV.P. 56(e)(2). The party opposing summary judgment must present specific, admissible facts from which a rational trier of fact could find in his favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, the Court must consider the record, and all reasonable inferences therefrom, in the light most favorable to the party opposing the motion. *Adler* at 670 (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505, 91 L.Ed.2d 265).

As to Counts I, II, and III, which allege hostile work environment, disparate treatment, and retaliation, respectively, under the NMHRA, the Court notes that New Mexico relies upon the same burden-shifting scheme and the same type of evidence whether the claim is brought under the NMHRA or Title VII. *See, e.g., Littell v. Allstate Ins. Co.*, 2008-NMCA-012, ¶ 15, 143 N.M. 506, 177 P.3d 1080 (noting that a harassment claim under the NMHRA becomes actionable "when the offensive conduct becomes so severe and pervasive that it alters the conditions of the employment"); *Sonntag v. Shaw*, 2001-NMSC-015, ¶ 27, 130 N.M. 238, 22 P.3d 1188 (noting that New Mexico, when considering discrimination claims pursuant to the NMHRA, "borrowed from the federal methodology for establishing discrimination claims under Title VII of the Civil Rights Act when no direct evidence of discriminatory motive exists"); and

*Ocana v. Am. Furniture Co.*, 2004-NMSC-018, ¶ 33, 135 N.M. 539, 91 P.3d 58 (applying Title VII's scheme for proving retaliation).

III.    DISCUSSION

    **A.    Summary Judgment is Appropriate As To Andreas' Hostile Work Environment Claim.**

      To establish hostile work environment, plaintiffs must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [their] employment." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986) (internal quotation marks omitted).  "Pervasiveness and severity are independent and equal grounds upon which a plaintiff may establish this element of a hostile environment claim." *Tademy v. Union Pac. Corp.*, 520 F.3d 1149, 1161 (10th Cir. 2008) (quoting *Witt v. Roadway Express*, 136 F.3d 1424, 1432 (10th Cir. 1998)).  Thus, "a sufficiently severe episode may occur as rarely as once ..., while a relentless pattern of lesser harassment that extends over a long period of time also violates the statute."  *Id.* at 1162 (quoting *Cerros v. Steel Techs., Inc.*, 288 F.3d 1040, 1047 (7th Cir. 2002)).

      In analyzing whether a plaintiff has made the requisite showing, the Court "consider[s] the work atmosphere both objectively and subjectively, looking at all the circumstances from the perspective of a reasonable person in the plaintiff's position."  *Id.* (quoting *Herrera v. Lufkin Indus., Inc.*, 474 F.3d 675, 680 (10th Cir. 2007)).  "The mere utterance of a statement which 'engenders offensive feelings in an employee would not affect conditions of employment to [a] sufficiently significant degree to violate Title VII.'" *Gross v. Burggraf Const. Co.*, 53 F.3d 1531, 1537 (10th Cir. 1995) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).  "Title VII is not a code of workplace conduct, nor was it designed

7

to bring about a magical transformation in the social mores of American workers." *Chavez v. New Mexico*, 397 F.3d 826, 833 (10th Cir. 2005).  Indeed, the Supreme Court has anticipated that lower courts will filter out "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

Separate and apart from questions of severity and pervasiveness, Andreas must also show that Bailey's conduct was based on gender.  *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994) (holding that "[i]f the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment").  "[W]orkplace harassment, even harassment between men and women is not automatically discrimination because of sex merely because the words used have sexual content or connotations.  'The critical issue ... is whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed.'" *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 25, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).

Conduct sufficient to sustain a hostile work environment claim was detailed in *O'Shea v. Yellow Tech. Servs., Inc.*, where the plaintiff spent five months in an environment with a coworker "making fun of his wife and making other derogatory comments about women such as that women talk too much and are less intelligent than men."  185 F.3d 1093, 1098 (10th Cir. 1999).  The plaintiff's co-worker in *O'Shea* also told others that the plaintiff was incompetent, hysterical, overemotional, and unable to do her job, and that women in general were

8

incompetent, stupid, and scatterbrained.  *Id.*  The same co-worker also allegedly told other employees that the plaintiff was going to file a sexual harassment lawsuit, causing them to cut off contact with her and treat her poorly, including refusing to provide plaintiff with a computer password necessary to perform her work.  *Id.* at 1099.

In *Chavez*, the Tenth Circuit similarly reversed summary judgment for a defendant. There, the plaintiffs presented evidence that a supervisor purposefully rubbed the front side of his body against a plaintiff's backside, stared at female employees in a lewd and lascivious manner, and massaged his genitals as female employees attempted to move past him to exit a room.  397 F.3d at 833-34.  The same supervisor also sexually propositioned a female employee in exchange for not issuing a reprimand letter.  *Id.* at 834.

By contrast to both *O'Shea* and *Chavez*, the Tenth Circuit affirmed summary judgment in favor of the employer in *Penry v. Federal Home Loan Bank of Topeka*, 155 F.3d 1257 (10th Cir. 1998).  The female plaintiffs in *Penry*, who were often required to travel with their male supervisor on business, alleged that their supervisor would routinely leave hotel clerks with the impression they were sharing a room and insist that they work in his hotel room during the day. *Id.* at 1260.  Additionally, the supervisor would take plaintiffs to eat at Hooters while on out-of-town trips; comment when one of their bra straps was showing, saying that he liked it that way; ask what they were wearing under their dresses; and tell others that his female staff allowed him to get into their drawers at any time—intending to employ a double entendre.  *Id.*  In addition to all of this, the plaintiffs in *Penry* complained that their supervisor constantly touched them unnecessarily, referred to them as "gals," and stared at them in a suggestive manner.  *Id.* Considering the complete context of plaintiffs' environment, the Tenth Circuit was "unable to

9

conclude that a rational jury could find that plaintiffs' workplace was permeated with discriminatory intimidation." *Id.* at 1263. The Circuit felt the alleged incidents of harassment, which occurred over a period of three years, were "too few and far between to be considered sufficiently severe or pervasive to alter the conditions of the victims' employment and create an abusive working environment." *Id.* (citations and quotations omitted). The Circuit concluded that "[t]he vast majority of [the supervisor's] behavior set forth in the plaintiffs' 200-paragraph statement of facts seems motivated by poor taste and a lack of professionalism rather than by the plaintiffs' gender." *Id.*

At the outset, the Court finds that Andreas has alleged no incidents that qualify as "severe." *See, e.g., Tademy v. Union Pacific Corp.*, 520 F.3d 1149, 1162 (10th Cir. 2008) (noting that graffiti and cartoons using the word "nigger" and the appearance of a life-sized noose were "allegations asserting severe rather than pervasive harassment" in a race case). The question, therefore, is whether the incidents alleged by Lopez are sufficiently pervasive to create a hostile work environment.

Like the plaintiffs' claims in *Penry*, the Court finds that Andreas' allegations demonstrate unprofessional and inappropriate conduct by Defendant Bailey at times, but this conduct is not so pervasive as to alter Andreas' work environment. Bailey's comments about Andreas' previous job at Hooters, his comments that women were "too sensitive," his statements that Andreas would get an ice cream cone or a gold star, and even Bailey's allegedly motivational efforts where he told representatives that he'd bet they would get their cold calls made if he put a gun to their heads or hit them in their faces with a shovel or where he would ask Andreas if she wanted to go back to being a waitress or if she wanted her daughter to end up like her—all of

these instances are examples not of sexual harassment but of "ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing." *Faragher*, 524 U.S. at 788.

Additionally, Andreas' alleged incidents of harassment occur over a period of four years and are simply "too few and far between" to create an abusive working environment. *Penry*, 155 F.3d at 1263 (noting that incidents occurring sporadically over a three-year period were not sufficiently pervasive to have altered the plaintiffs' working environment). The incidents for which Andreas is able to provide even approximate dates appear to have occurred from September 2001-September 2002 (when Bailey allegedly berated Andreas to the point of tears once a week), in January 2002 (when Andreas won Rookie of the Year and Bailey commented that he was surprised she was still there and that he didn't think she'd make it), January 2004 (the awards banquet where Bailey and others allegedly taunted Andreas to "jump"), July 2004 (the baseball game), and January 2005 (the awards banquet where Bailey allegedly took a picture down the front of Andreas' dress). More regular instances of harassment are necessary to support a claim for pervasive sexual harassment. *See, e.g., Tademy*, 520 F.3d at 1162 (referencing "a relentless pattern of lesser sexual harassment that extends over a long period of time").

Many of Andreas' allegations also appear to be unrelated to gender, providing a separate and further reason why her hostile work environment claim cannot survive summary judgment. There are no allegations of overt sexual conduct or physical contact like that at issue in *Chavez,* and there is no evidence of constant gender-related derogation like that alleged in *O'Shea*. Even considering Bailey's facially neutral conduct together with the gender-related conduct, *O'Shea*,

11

185 F.3d at 1097, the Court finds no reasonable jury could find that Andreas has established a claim for hostile work environment.

> **B.**     **Andreas' Disparate Treatment Claim Cannot Survive Summary Judgment.**
>
> **1.**     **Disparate treatment claims are barred to the extent they arise from discrete actions prior to April 2, 2005.**

Title VII and the New Mexico HRA require that charges of discrimination be filed within 300 days after the alleged act of discrimination.  42 U.S.C. § 2000e-5(e)(1); NMSA 1978 § 28-1-10(A).  Failure to timely file generally results in dismissal for failure to exhaust administrative remedies.  *See, e.g., Keller v. Board of Educ.*, 182 F.Supp.2d 1148, 1163 (D.N.M. 2001).

It is undisputed in this case that Andreas filed her Charge of Discrimination in January 2006. *Memo.* at 11 & Ex. O (copy of Andreas' Charge of Discrimination stamped "received" by EEOC on January 31, 2006); *Resp.* at 12 (alleging that Andreas' Charge was filed January 27, 2006).  Bailey contends any claims arising from discriminatory conduct prior to April 6, 2005 are therefore barred for failure to exhaust administrative remedies.  *Memo.* at 11.  Although the parties dispute the date of the discrimination charge by four days, *Resp.* at 19 (contending that incidents occurring after April 2, 2005 are within the limitations period), neither party claims that any discriminatory conduct occurred within this four-day window.  This dispute is therefore irrelevant to the Court's analysis of timeliness.

Timeliness is an issue because Andreas' claims allegedly arise from disparate treatment that occurred prior to April 2005.  Specifically, Andreas claims that Bailey distributed better leads to male financial representatives.  In 2003, she contends that she received zero leads from a source whereas a male representative, Antonio Molina, received nine from the same source. *Resp.* at 13.  Although Andreas failed to file a timely charge of discrimination within 300 days of

12

the 2003 lead distributions, she contends these earlier instances are actionable as part of her disparate treatment claim because "there is at least one instance in which Andreas did not receive a lead within the time-filing period." *Id.* at 23.  This instance is the April 8, 2005 occasion when Andreas contends that Bailey distributed a St. Vincent lead to her male coworker rather than to her.  Prior to the April 8, 2005 incident, Andreas claims "[s]he was aware that there was ongoing disparate treatment, but had no knowledge of a particular day on which it occurred," and that each instance when leads were distributed unfairly based on gender is not a discrete act but is instead "akin to a 'single employment practice'" or "more like a hostile environment claim." *Id.* She nonetheless seeks to recover for these instances pursuant to her disparate treatment claim.

To the extent that Andreas' claim arises from "discrete acts of discrimination or retaliation that occur outside the statutory time period," the United States Supreme Court has held that Title VII does not permit recovery.  *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002).  *Accord Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1202 (10th Cir. 2003) (holding that "since discrete acts are easily identifiable and individually actionable, acts that occurred outside of the limitations period, even though related to those occurring within the period, are not actionable").  The New Mexico Supreme Court has found the *Morgan* opinion persuasive and has "adopt[ed] a similar approach to time limitations under the NMHRA." *Ulibarri v. State of New Mexico Corr. Acad.*, 2006-NMSC-009, ¶ 11, 139 N.M. 193, 131 P.3d 43.

Examples of discrete acts are termination, failure to promote, denial of transfer, or refusal to hire.  *Morgan*, 536 U.S. at 114.  A "pay-setting decision" is also a discrete act, in that it takes place at a particular point in time.  *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618,

___, 127 S.Ct. 2162, 2165, 167 L.Ed.2d 982 (2007).  In *Ledbetter*, the Court rejected the

plaintiff's argument that denials of pay increases occurring outside the limitations period should

be actionable because she received the disparate pay, or felt the effect of the prior discrete act,

during the limitations period.  *Id.* (holding that "because a pay-setting decision is a discrete act

that occurs at a particular point in time, these arguments must be rejected").  "[C]urrent effects

alone cannot breathe life into prior, uncharged discrimination."  *Id.* at 2169 (citing *United Air*

*Lines, Inc. v. Evans*, 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977)).

     Under the reasoning of *Morgan* as applied in *Ledbetter*, Bailey's distributions of sales

leads are discrete acts.  Bailey's decisions to provide the leads to certain representatives over

others occurred at particular points in time; thus, the clock for filing charges as to each

distribution of a lead should run from the point  the lead was given.

     The Lilly Ledbetter Fair Pay Act of 2009, signed into law by President Obama on

January 29, 2009, overrules the *Ledbetter* decision in that it expands "the time period in which

victims of discrimination can challenge and recover for discriminatory compensation decisions."

Lilly Ledbetter Fair Pay Act of 2009, S. 181, 109th Cong. § 2 (2009) (enacted).  Whereas

*Ledbetter* provides that an unlawful employment practice related to compensation occurs—and

thus the clock for filing charges begins to run— at the time the pay-setting decision occurs, the

Act revises the law to provide that the unlawful employment practice occurs at any one of three

times: (1) when the compensation practice or decision is adopted; (2) when the individual

becomes subject to it; or (3) when an individual is affected by the application of it.  *Id.*  As

applied to the present case, the Act allows Andreas' claims regarding the disparate distribution

of sales leads prior to April 2005 to survive only if Andreas became subject to those decisions, or

if her pay was affected by those decisions, after April 2, 2005.

Andreas has not presented facts sufficient to trigger the Act. Other than the April 8, 2005 incident, Andreas does not allege any specific dates on which Bailey distributed leads in a discriminatory manner or on which she received unequal compensation as a result of Bailey's distribution decisions. Andreas claims sales leads were distributed unequally between certain representatives in 2003, 2004, and 2005, and she argues without offering supporting evidence that a male representative (Lucas Romero) earned two or three times the amount of commissions earned by female representatives Lopez and Milliorn in 2005. *Resp.* at 13. But there are no allegations or documents indicating that Andreas received disparate pay or was otherwise affected by the lead distributions within 300 days of her charge of discrimination. Consequently, the Court will grant Bailey's motion for summary judgment on Count II (disparate treatment) as to all claims of disparate treatment arising prior to the limitations period.

**2.      Andreas' timely claims of disparate treatment cannot survive summary judgment.**

Lopez claims the following five incidents of disparate treatment occurred after April 2, 2005: (1) Bailey's April 8, 2005 assignment of a St. Vincent lead to Lucas Romero over Andreas; (2) Andreas' alleged constructive discharge on April 15, 2005; (3) withholdings from Andreas' commissions in May 2005; (4) the August 2005 refusal to release Andreas' commissions; and (5) Bailey's alleged threat to send Andreas to collections in November 2005. *Resp.* at 23. As shown in more detail below, none of these claims can survive summary judgment.

**a.      Andreas cannot overcome Bailey's legitimate non-discriminatory explanation for Bailey's April 8, 2005 distribution of a sales lead.**

15

Assuming that Andreas successfully establishes a prima facie case of disparate treatment[1] relating to the April 8, 2005 sales lead, the burden shifts to Defendant Bailey to articulate a legitimate non-discriminatory explanation for the adverse action alleged by Andreas.  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  Along these lines, Bailey points out that it would have benefitted neither Northwestern Mutual nor the potential purchaser of insurance to be assigned to an agent who had already resigned and who was set to leave Northwestern Mutual within a week of the date the lead was provided.  *Reply* at 2.  Thus, Bailey contends it was best for both Northwestern Mutual and its customer to assign the lead to someone other than Andreas—to a representative who could service the customer's account over the long term.

Since Bailey has met the burden of articulating a non-discriminatory explanation for giving the April 8, 2005 lead to Lucas Romero, Andreas must show that Bailey's proffered explanation was pretextual or unworthy of belief.  *Id.*  "The plaintiff—once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision—must be afforded the 'opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting (*Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)).  "Pretext can be shown by 'such weaknesses,

---

[1]Andreas must prove the following three elements in order to establish a prima facie case for disparate treatment: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) similarly situated employees were treated differently.  *Trujillo v. Univ. of Colo. Health Sciences Ctr.*, 157 F.3d 1211, 1215 (10th Cir. 1998).

16

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact-finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons.'" *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951-52 (3rd Cir. 1996)).

Andreas has failed to show any weaknesses, implausibilities or other evidence sufficient to allow a reasonable jury to find pretext.  She claims that Bailey had previously helped male agents in danger of meeting their sales requirements but ignores the fact that she had resigned well before April 8, 2005.  As Bailey points out, however, there is no evidence that Andreas' failure to meet TAP requirements mattered as of April 8, 2005, when she was one week away from the date her resignation became effective.  *Semsroth v. City of Wichita*, No. 07-3155, 2008 WL 5328466, at *7 (10th Cir. Dec. 22, 2008) (holding that an adverse employment action requires a "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits" (quoting *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir.2007) (internal citations and quotations omitted))).  Bailey also notes that Andreas has failed to offer evidence of others who were truly similarly situated to Andreas in that they were scheduled to leave Northwestern Mutual within a week of Bailey's assistance in meeting their sales requirements. The claim regarding the April 8, 2005 lead should therefore be dismissed for multiple reasons: (1) Andreas has not proven adverse employment action; (2) Andreas has not identified similarly situated others; and (3) Andreas has not offered evidence from which a reasonable jury could find that Bailey's nondiscriminatory explanation was mere pretext.

17

### b.      No reasonable jury would find constructive discharge.

To survive summary judgment on a claim for constructive discharge, Andreas must show

not only that she was subject to offensive behavior severe or pervasive enough to alter her

working conditions but further that her working conditions were "so intolerable that a reasonable

person would have felt compelled to resign." *Pennsylvania State Police v. Suders*, 542 U.S. 129,

147-48, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).  "Essentially, a plaintiff must show that she

had no other choice but to quit." *Gormley v. Coca-cola Enterprises*, 2005-NMSC-003, ¶ 10, 137

N.M. 192, 109 P.3d 280 (quoting *Yearous v. Niobrara County Mem'l Hosp.*, 128 F.3d 1351,

1356 (10th Cir. 1997).

Examples of facts sufficient to support a claim for constructive discharge include cases

where an employee was reassigned to a position with any job title or description at less than 50%

of her former salary with her office relocated to a supply closet, *Keller v. Bd. of Educ.*, 182

F.Supp.2d 1148, 1157 (D.N.M. 2001), and where an employee's supervisor regularly brought up

the subject of people having sex with animals whenever she entered his office, commented that

young girls should be instructed how to perform oral sex, sat next to her and spread his legs

while wearing spandex shorts, and grabbed his genitals and shouted out vulgarities, *Suders*, 542

U.S. at 134.

Because Andreas' allegations in the present case do not rise to the level of a hostile work

environment, *see Part III.A, infra*, the Court finds that a reasonable jury would also decline to

find that Lopez' working conditions were "so intolerable that a reasonable person would have

felt compelled to resign." *Suders* at 148.  *See also Ulibarri v. New Mexico Corrections

Academy*, 2006-NMSC-009, ¶ 14, 139 N.M. 193, 131 P.3d 43 (holding that "[i]n order to

18

establish that she was constructively discharged, Plaintiff must meet an even higher standard than that required for sexual harassment").

> **c.** **Andreas has not presented evidence of similarly situated others who were treated differently in terms of commission; Bailey has offered legitimate non-discriminatory explanations for his commission-related actions; and Andreas has not offered evidence of pretext.**

Andreas' allegations of disparate treatment with regard to commissions are three-fold. First, she argues that Bailey withheld more from her May 2005 commission than was permitted by Northwestern Mutual policy and failed to release her May 2005 commissions to her. *Resp.* at 23. Second, Andreas claims that Bailey wrongfully refused to release her commissions upon her request in August 2005. *Id.* Third, Andreas contends that Bailey discriminated against her in November 2005 when he threatened to send her to collections because a commission which had already been paid out was reversed. Andreas cannot establish a prima facie claim for disparate treatment as to any commission-related action because she is unable to show that Bailey treated her male coworkers differently. For this reason alone, summary judgment should be granted as to these claims. Bailey has also articulated a legitimate, non-discriminatory explanation for the commission-related actions in this case, and summary judgment is appropriate for a further reason in light of Andreas' inability to offer evidence that renders Bailey's explanation implausible.

Initially, Andreas does not offer evidence that Bailey treated her male counterparts differently with respect to commissions. The Court has found nothing in the parties' submissions that tends to show Bailey treated men differently regarding commissions. In fact, the evidence upon which Andreas relies tends to contradict her argument. Although he

19

threatened to send her to collections, Andreas contends that Bailey allowed male representatives to pay off their balances in small increments over months or years "or let it go completely." *Resp.* at 12.  As evidence of her contention, Andreas points to collections actions initiated in February and March 2006 against two male agents.  *Id.; Pls.' Resp. to Northwestern Mut.'s Memo. In Supp. Of Summ. Judgmt. On Andreas' Clms.* (Doc. 128) at Ex. Q.  Not only do these documents fail to show whether and for how long Bailey "let it go" as to these male representatives, but, in the Court's view, the initiation of these actions tends to disprove disparate treatment, showing that in fact Bailey did not "let it go" when terminated male representatives owed Northwestern Mutual money.

Contrary to Andreas' allegations that all of Bailey's commission-related actions were the result of discriminatory intent, Bailey has testified that he withheld 10% from all representatives' commission checks for the benefit of the representatives.  *Memo.* at Ex. G, p. 244 (testifying that "[i]t was their money, but it would help them to offset any reversals that they might have").  A higher percentage could be withheld where commissions were particularly high, according to Bailey, and this withholding was also for the protection of the representatives.  *Id.* at Ex. G, p. 245 (testifying that he would discuss breaking up large commissions to protect the agent and explaining "most people don't know [] that a lot of people end up leaving the business because they financially go in the toilet because they write a big case, they spend all the money, and then the policy reverses.  So we do that to protect them").  Higher percentages might also be withheld in the event that the representative terminated.  *Id.* at Ex. G, p. 247.  Presumably, this practice was to protect Northwestern Mutual in the event that commissions were later reversed.  Indeed, in Andreas' case, the commissions paid to her in November 2005 were reversed, requiring her to

20

repay Northwestern Mutual some $1,200.  *Id.*; *Resp.* at 11-12.  Andreas has not offered evidence

to show that Bailey's articulated reasons for his commission-related actions were pretextual, and

summary judgment will therefore be granted.

      **C.**    **Plaintiff Lacks Sufficient Evidence of Retaliation to Survive Summary Judgment.**

      Proof of the following elements is required to make a prima facie case for retaliation

under Title VII and the New Mexico Human Rights Act: (1) protected activity by the plaintiff;

(2) adverse employment action against the plaintiff; and (3) a causal connection between the

protected activity and the adverse employment action.  *Ulibarri*, 2006-NMSC-009, ¶ 16, 139

N.M. 193, 131 P.3d 43.  Upon proof of these elements, the burden then shifts to the defendant to

articulate a nondiscriminatory reason for its alleged retaliation, which the plaintiff may then

rebut with evidence of pretext.  *Gonzales v. Dept. of Health*, 2000-NMSC-029, ¶ 21, 129 N.M.

586, 11 P.3d 550.

      Andreas' only protected activity consists of the "numerous occasions" when she

allegedly complained to Bailey that his actions were discriminatory and harassing.  *Resp.* at 25.

She claims that Bailey took adverse employment action against her in the form of continuing the

discriminating and harassing behavior.  *Id.*  Because Andreas fails to provide any dates either of

her protected activity or Bailey's alleged harassment, there is no evidence from which the Court

can find any causal connection is established.  *Piercy v. Maketa*, 480 F.3d 1192, 1198 (10th Cir.

2007) (recognizing that absent additional evidence, a three-month separation between the

protected activity and the adverse action was too great to justify an inference of causal

connection).

      Moreover, given Andreas' acknowledgment that Bailey did not harass her after April 6,

2005, *Memo.* at 5 & Ex. E at 205:5-17, any claims relating to Bailey's alleged retaliation in the form of his harassing behavior are time-barred.  42 U.S.C. § 2000e-5(e)(1) (requiring that charges of discrimination be filed within 300 days after the alleged act of discrimination); NMSA 1978, § 28-1-10(A) (same under the HRA).  *Accord Nat'l R.R. Pass. Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (holding that Title VII "precludes recovery for discrete acts of discrimination or retaliation that occur outside the statutory time period"); *Ulibarri*, 2006-NMSC-009 at ¶ 11 (finding the Supreme Court's opinion in *Morgan* "persuasive" and adopting "a similar approach to time limitations under the []HRA").

Perhaps in recognition of the limitations problem, Andreas claims that Bailey's "retaliation continued after [she] left NML" in the form of Bailey's alleged post-termination commissions actions. *Resp.* at 25.  Because Andreas does not allege any dates when her allegedly protected activity occurred, the Court cannot infer a causal connection between Andreas' complaints and the commissions actions.  *Piercy*, 480 F.3d at 1198.  Summary judgment is therefore appropriate on Andreas' retaliation claims pursuant to Title VII and NMHRA for failure to a make a prima facie case.

      D.      **Plaintiff Cannot Meet Her Burden to Show that Bailey Played an "Active and Substantial Part" in Causing Her to Lose the Benefit of Her Contract with Northwestern Mutual.**

To show that Bailey unlawfully interfered in her relationship with Northwestern Mutual, Andreas must prove that: (1) Bailey knew of her contract with Northwestern Mutual; (2) the contract went unfulfilled or performance was otherwise interrupted; (3) Bailey played "an active and substantial part" in causing Andreas to lose the benefit of that contract; (4) Andreas suffered damages as a result; and (5) Bailey lacked justification or privilege for his actions.  *Martin v.*

22

*Franklin Capital Corp.*, 2008-NMCA-052, ¶ 7, 145 N.M. 179, 195 P.3d 24.  *See also Fikes v.*

*Furst*, 2003-NMSC-033, ¶ 20, 134 N.M. 602, 81 P.3d 545 ("In order to prevail on a claim of

tortious interference with contract, [the plaintiff] must prove that [the defendant] took action that

persuaded [a third party] to break its commitment [to plaintiff], and that [plaintiff] accomplished

this either with an improper motive or through improper means"); *Ettenson v. Burke*, 2001-

NMCA-003, ¶ 14, 130 N.M. 67, 17 P.3d 440 ("[The plaintiff] had to prove that (1) [the

defendant] had 'knowledge of the contract' between [the plaintiff] and [a third party]; (2)

performance of the contract was refused, (3) [the defendant] 'played an active and substancial

part in causing [the plaintiff] to lose the benefits of his contract,' (4) damages flowed from the

breached contract, and (5) [the defendant] induced the breach 'without justification or privilege

to do so'").

The parties do not dispute the existence of a contract between Andreas and Northwestern

Mutual, nor do they dispute the termination of the contract.  Andreas has not shown, however,

that Bailey "played an active and substantial part in causing [her] to lose the benefits of [her]

contract."  *Ettenson* at ¶ 14 (quoting *Wolf v. Perry*, 65 N.M. 457, 461-62, 339 P.2d 679, 681-82

(1959)).  *See also Martin* at ¶ 7 ("*If the defendant interfered in some way with the plaintiff's*

*contract*, "[t]he inquiry, in the end should be to determine the [defendant's] primary motivation

for the interference" (emphasis added) (quoting *Fikes* at ¶ 23)).  As noted in Parts III.A, B, and C

herein, Andreas lacks sufficient evidence to support her claims for sexual harassment, disparate

treatment, or retaliation.  She similarly lacks adequate evidence to support her claim of

constructive discharge.  Consistent with these prior rulings, the Court cannot find that Bailey

played an active or substantial part in causing Andreas to terminate her employment contract.

For these reasons, the Court will grant Bailey's Motion and dismiss with prejudice Andreas'

claim for intentional interference with contract.

       **E.**      **Andreas Cannot Prevail on Her Claim that Bailey Breached the Duty of Good Faith and Fair Dealing.**

"[T]he covenant of good faith and fair dealing 'requires that neither party do anything

that will injure the rights of the other to receive the benefit of their agreement.'" *Henning v.*

*Rounds*, 2007-NMCA-139, ¶ 26, 142 N.M. 803, 171 P.3d 317 (quoting *Bourgeous v. Horizon*

*Healthcare Corp.*, 117 N.M. 434, 438, 872 P.2d 852, 856 (1994)).  New Mexico courts have held

that this covenant "is breached only when a party seeks to prevent the contract's performance or

to withhold its benefits from the other party."  *Smoot v. Physicians Life Ins. Co.*, 2004-NMCA-

027, ¶ 13, 135 N.M. 265, 87 P.3d 545 (quoting *Azar v. Prudential Ins. Co.*, 2003-NMCA-062, ¶

51, 133 N.M. 669, 68 P.3d 909).

      Like the plaintiff in *Henning*, Andreas was not terminated or demoted, and she did not

suffer a reduction in pay or benefits.  2007-NMCA-139, ¶ 26.  Andreas does not present

evidence that Bailey sought to prevent performance of the contract between Andreas and

Northwestern Mutual.  *Smoot* at ¶ 13.  Instead, Andreas contends Bailey's allegedly

discriminatory and harassing conduct caused her to resign and thereby lose the benefits of her

contract with Northwestern Mutual.  *Lopez' Resp. to Def. Bailey's Motion for Summ. Judgmt.* at

29.  Where a plaintiff fails to show actual denial of a contractual benefit, the New Mexico Court

of Appeals held that it would be "reluctant to sanction a claim for breach of the covenant of good

faith and fair dealing."  *Henning* at ¶ 28 (explaining that "to allow such suits would

unnecessarily involve courts in the employer-employee relationship and potentially subject

employers to torrents of unwarranted and vexatious suits filed by disgruntled employees at every

juncture in the employment process (internal citation and quotation omitted)).  Further, New Mexico courts recognize that "[t]here is no general duty on the part of an employer to act 'nicely.'" *Id.* (internal citation and quotation omitted).

For these reasons, and further because Plaintiff has not shown evidence sufficient to support her claims of harassing, discriminatory, or retaliatory conduct on the part of Defendant Bailey, the Court will grant Bailey's Motion for Summary Judgment as to Andreas' claim for breach of the implied covenant of good faith and fair dealing.

**IV.    CONCLUSION**

Having reviewed the parties' briefings and being otherwise fully informed, the Court determines there are no genuine disputes as to material issues of fact, and summary judgment should therefore be granted in favor of Defendants as to Counts I (gender harassment under NMHRA), II (gender discrimination under NMHRA), III (retaliation under NMHRA), VI (intentional interference with business relations or contract), and VII (breach of the covenant of good faith and fair dealing).  Counts IV (retaliatory discharge) and V (negligent supervision) are alleged solely against Defendant Northwestern Mutual and are therefore not addressed in this motion.

IT IS THEREFORE ORDERED that *Defendant Bailey's Motion for Summary Judgment on Plaintiff Andreas' Claims* (Doc. 112), filed June 30, 2008, is GRANTED.  Counts I, II, III, VI, and VII are therefore dismissed with prejudice.

Dated March 26, 2009.

s/John Edwards Conway

_____

SENIOR UNITED STATES DISTRICT JUDGE

25

Counsel for Plaintiffs:

Christopher M. Moody, Esq.
Whitney Warner, Esq.
Julie K. Fritsch, Esq.
Albuquerque, NM

Counsel for Defendants:

Barbara G. Stephenson, Esq.
Justin E. Poore, Esq.
Albuquerque, NM